UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

CAMERON G.,[1]

          Plaintiff,

   v.

COMMISSIONER, SOCIAL SECURITY
ADMINISTRATION,

         Defendant.

Case No. 3:21-CV-00353-YY

OPINION AND ORDER

YOU, Magistrate Judge.

Plaintiff Cameron G. seeks judicial review of the final decision by the Commissioner of the Social Security Administration ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. This court has jurisdiction to review the Commissioner's decision pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, that decision is REVERSED and this matter is REMANDED for immediate award of benefits.

## BACKGROUND

Plaintiff protectively filed for DIB on August 20, 2018, alleging disability beginning on February 1, 2002. Plaintiff's application was initially denied on October 23, 2018, and upon

---

[1] In the interest of privacy, the court uses only plaintiff's first name and the first initial of plaintiff's last name.

reconsideration on March 4, 2019.  Plaintiff requested a hearing before an Administrative Law

Judge ("ALJ"), which took place on April 22, 2020, by telephone due to the pandemic.  Plaintiff

and a vocational expert testified at the hearing.  The ALJ issued a decision on May 7, 2020,

finding plaintiff not disabled within the meaning of the Act.

The Appeals Council denied plaintiff's request for review on January 21, 2021.  Tr. 1-3.

Therefore, the ALJ's decision is the Commissioner's final decision and subject to review by this

court.  20 C.F.R. § 416.1481.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if it is based on proper

legal standards and the findings are supported by substantial evidence in the record.  42 U.S.C.

§ 405(g); *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).  This court must weigh the

evidence that supports and detracts from the ALJ's conclusion and "'may not affirm simply by

isolating a specific quantum of supporting evidence.'"  *Garrison v. Colvin*, 759 F.3d 995, 1009-

10 (9th Cir. 2014) (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007)).  This

court may not substitute its judgment for that of the Commissioner when the evidence can

reasonably support either affirming or reversing the decision.  *Parra v. Astrue*, 481 F.3d 742, 746

(9th Cir. 2007).  Instead, where the evidence is susceptible to more than one rational

interpretation, the Commissioner's decision must be upheld if it is "supported by inferences

reasonably drawn from the record."  *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008)

(citation omitted); *see also Lingenfelter*, 504 F.3d at 1035.

## SEQUENTIAL ANALYSIS AND ALJ FINDINGS

Disability is the "inability to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death

or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act.  20 C.F.R. § 416.920; *Lounsbury v. Barnhart*, 468 F.3d 1111, 1114 (9th Cir. 2006) (discussing *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999)).  The claimant bears the burden of proof at steps one through four.  *Bustamante v. Massanari*, 262 F.3d 949, 954 (9th Cir. 2001).  The Commissioner bears the burden of proof at step five.  *Id.* at 953-54.

At step one, the ALJ found plaintiff had not engaged in substantial gainful activity since February 1, 2002, the alleged onset date.  Tr. 17.  At step two, the ALJ determined that, prior to attaining age 22,[2] plaintiff had the severe impairments of posttraumatic stress disorder ("PTSD"), major depressive disorder, an unspecified anxiety disorder, and gender dysphoria.  Tr. 16.

At step three, the ALJ found that, prior to attaining age 22, plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR §§ 404.1520(d), 404.1525, and 404.1526). Tr. 18.

The ALJ next assessed plaintiff's residual functional capacity ("RFC") and determined he had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: he was limited to understanding and carrying out simple instructions consistent with a reasoning level of one or two, and he was limited to occasional contact with the general public.  Tr. 18.

---

[2] *See* 20 C.F.R § 404.350 (explaining child benefits for disabilities that began before the claimant became 22 years old).

At step four, the ALJ found that, considering plaintiff's age, education, work experience, and residual functional capacity, there were jobs that exist in significant numbers in the national economy that he could perform, including janitor, hand packager, and automobile detailer. Tr. 24. Thus, the ALJ concluded plaintiff was not disabled. *Id.*

## DISCUSSION

## I.   Subjective Symptom Testimony

Plaintiff contends the ALJ "erred in her consideration of [his] allegations about the impact of his impairments on his ability to maintain concentration, persistence, and pace sufficient to perform work-related activities on a regular and continuing basis." Pl. Br. 8. Plaintiff argues the ALJ selectively referenced statements from his school and medical records, and erroneously relied on his activities and purported evidence of secondary gain. *Id.* at 13-14.

### A.    Relevant Law Regarding Assessing a Claimant's Testimony

When a claimant has medically documented impairments that could reasonably be expected to produce some degree of the symptoms complained of, and the record contains no affirmative evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of . . . symptoms only by offering specific, clear and convincing reasons for doing so." *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996) (citation omitted). A general assertion that the claimant is not credible is insufficient; the ALJ must "state which . . . testimony is not credible and what evidence suggests the complaints are not credible." *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993). The proffered reasons must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) (internal citation omitted).

If the "ALJ's credibility finding is supported by substantial evidence in the record, [the court] may not engage in second-guessing." *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (citation omitted). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) (citation omitted). "Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld." *Id.*

Effective March 28, 2016, the Commissioner superseded Social Security Ruling ("SSR") 96-7p, governing the assessment of a claimant's "credibility," and replaced it with SSR 16-3p. *See* SSR 16-3p, *available at* 2016 WL 1119029. SSR 16-3p eliminates the reference to "credibility," clarifies that "subjective symptom evaluation is not an examination of an individual's character," and requires the ALJ to consider all the evidence in an individual's record when evaluating the intensity and persistence of symptoms. *Id.* at *1-2. The ALJ must examine "the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id.* at *4. SSR 16-3p explains that "[w]hen a Federal court reviews our final decision in a claim, we expect the court will review the final decision using the rules that were in effect at the time we issued the decision under review."

The decision under review is dated May 7, 2020. Tr. 25. Therefore, SSR 16-3p applies.

**B.    Paragraph B Criteria**

The ALJ found that plaintiff's mental impairments, considered singly or in combination, did not meet or medically equal the criteria for listings 12.04 (depressive, bipolar and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), or 12.15 (trauma- and stressor-

related disorders).  Tr. 16.  A mental disorder must satisfy both the paragraph A and B

requirements or both the paragraph A and C requirements to meet the listings.

The ALJ discussed the paragraph B criteria, which is the same for all three listings.  The

paragraph B criteria are met by:

> Extreme limitation of one, or marked limitation of two, of the following areas of
> mental functioning (see 12.00F):
>> 1.  Understand, remember, or apply information (see 12.00E1).
>> 2.  Interact with others (see 12.00E2).
>> 3.  Concentrate, persist, or maintain pace (see 12.00E3).
>> 4.  Adapt or manage oneself (see 12.00E4).

20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 12.04(B), 12.05(B), and 12.15(B).

The ALJ found plaintiff had only:

(1) Mild limitation in understanding, remembering, or applying information;

(2) Moderate limitation in interacting with others;

(3) Moderate limitation in concentrating, persisting, or maintaining pace; and

(4) Mild limitation in adapting or managing himself.

Tr. 17.  Otherwise stated, the ALJ found there were no extreme or marked limitations that

satisfied the paragraph B criteria and plaintiff therefore did not meet the listings.

In reaching this conclusion, the ALJ cited plaintiff's school records and mental health

treatment records.  Tr. 17 (citing Ex. 1F/5, 2E/3, 6F/4, 8F).  However, as discussed, the ALJ

improperly relied on only selective portions of those records and otherwise provided no clear and

convincing reasons to reject plaintiff's testimony.

### C.    School Records

Plaintiff contends the ALJ erred by selectively referencing portions of his school records

"while disregarding the larger picture drawn by those records."  Pl. Br. 10.  Indeed, as plaintiff

contends, the ALJ's interpretation of plaintiff's school records is unreasonable and not supported by substantial evidence.

The record reveals that, when plaintiff was five years old, he witnessed his father shoot and kill plaintiff's mother and then kill himself. Tr. 272; Tr. 952 ("I was there when it happened."). Plaintiff's father had been sexually abusing plaintiff prior to that, and plaintiff's mother had just obtained a restraining order against his father. *Id.* Plaintiff attempted suicide 3 times when he was 11 years old and 6 times when he was 12 years old, and had repeated thoughts and plans about dying between the ages of 11 and 16. *Id.* Plaintiff also engaged in cutting behavior between 2010 and 2015.[3] Tr. 954; *see*, *e.g.*, Tr. 488 (plaintiff cut his abdomen at least ten times in multiple directions with a boxcutter); Tr. 438 (plaintiff ran away for two nights and cut his arm multiple times); Tr. 431 (describing well-healed scratch marks on his wrists); Tr. 440 (plaintiff had several superficial cuts down length of inside forearm but also other arm "was cut vertically from the wrist all the way up and across the shoulder with deeper cuts").

Plaintiff's last suicide attempt was in 2012, when he was hospitalized after swallowing "a lot of pills," then attempted asphyxiation, and then tried to starve himself.[4] Tr. 952. Plaintiff was in the emergency room several times in 2013. Tr. 951. At one point, plaintiff was hospitalized with psychosis, but he does not remember the details. *Id.*

The ALJ observed that plaintiff was described as "quite intelligent" and "performed at or above grade level standards." Tr. 17. In fact, records show that plaintiff was "bright," did well

---

[3] Plaintiff was born in 1997 and would have been approximately 13 through 18 years old during this time period.

[4] Plaintiff also has had eating disorders, including anorexia and bulimia. Tr. 953; *see* Tr. 500 (plaintiff lost 20 pounds over 4 months causing concern to her primary care provider and family).

at times on state testing benchmarks, and was artistically gifted. Tr. 151. However, beginning in

2003, shortly after the shooting, plaintiff was in special education due to emotional disturbance.

Tr. 188. And while plaintiff may be inherently intelligent, he had serious attendance problems in

school, *see* Tr. 151 (attended school only 39 out of 68 days), and was consistently described as

withdrawn and unengaged. *See*, *e.g.*, Tr. 165-66 (kindergarten: withdrawn from group, not

responsive to peers and adults, wanders, and refuses to follow directions); Tr. 175-76 (sixth

grade: significant withdrawal, depression, low adaptive skills, cannot meet deadlines,

internalizing emotions, lack of social maturity); Tr. 185 (ninth grade: unable to maintain inter-

personal relationships with peers and teachers, variety of excessive behavior ranging from

hyperactive and impulsive to depression and withdrawal, acts strangely at times and seems

unaware of world around him). It is apparent from the record that plaintiff's absences were

related to his mental illness: chart notes indicate that plaintiff described an "intense fear that [he]

will spend the rest of [his] life in school and then die an early death when [he] graduates like

[his] mother. . . Thus, [he] has avoided school almost altogether. When [he] does go, [he] gets

good grades, but daydreams and worries that something bad is going to happen to [him]." Tr.

490; *see also* Tr. 496 (chart notes indicating plaintiff gets headaches and worries about going to

school); Tr. 499 (chart notes indicating plaintiff experiences more hallucinations at school).

Moreover, plaintiff's academic record contains report cards with failing grades, except

for some minimal improvement after transferring to an alternative high school. Tr. 279 (showing

GPAs of 0.00, 0.875 and 2.00); Tr. 280 (showing GPAs of 0.00, 1.625, and 2.00); Tr. 288

(describing the "alternative high school" as "specifically designed for students to who wish to

attend a small high school"). Even after repeating 12th grade at the alternative school, Tr. 1036,

plaintiff was again failing all of his classes, Tr. 280, and he neither graduated from high school nor obtained a GED.

Despite all of this, the ALJ found that plaintiff had only moderate limitation in concentrating, persisting, or maintaining pace.  Tr. 17.  Moderate limitation exists when a claimant's "functioning in this area independently, appropriately, effectively, and on a sustained basis is fair."  20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00(F)(2)(c).  As detailed above, plaintiff's school records do not show that he could operate independently, appropriately, effectively, or on a sustained basis.  In fact, in school plaintiff was assigned a learning specialist, described as a "positive, supportive adult . . . to help [him] stay on task, refocus when needed, and be successful overall in school."  Tr. 178; Tr. 168-69 (assigned learning specialist for daily check in to discuss "day to come & expectations"); Tr. 205 ("Given an assignment tracker and time to debrief with a trusted adult."); Tr. 303 (same); Tr. 1016 (plaintiff "reported that starting in kindergarten he had a 'wrangler' who would follow him around and support him when he lost emotional control").

For these reasons, the ALJ"s rejection of plaintiff's subjective complaints based on school records is not supported by substantial evidence.

### D.    Medical Records and PTSD

The ALJ also discounted plaintiff's testimony because "[b]ased on the medical evidence, [he] has been stable on medication with no anxiety or PTSD symptoms.  Tr. 21.  The ALJ observed that "more recent records" showed plaintiff's PTSD was in full remission.  Tr. 17, 20-21.  Again, the ALJ improperly relied on only select portions of the record to reach this conclusion.

The ALJ relied on records by Kate Kauffman, LPC, dated March and August 2018, in which she stated that plaintiff's PTSD was in full remission.  Tr. 17; *see* Tr. 848-49, 960.  But the record otherwise reflects that plaintiff was in "longstanding treatment" for PTSD.  Tr. 484 (May 2011: "[H]e has had longstanding treatment for posttraumatic stress disorder (PTSD) and appears to still have symptoms.").  "[I]t is error to reject a claimant's testimony merely because symptoms wax and wane in the course of treatment. Cycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working."  *Garrison*, 759 F.3d at 1017.

In fact, the same provider, Kauffman, found plaintiff was suffering from chronic PTSD only several months before, in October 2017.  Tr. 974.  And, in September 2018, just one month after Kauffman completed her August 2018 report, another mental health treatment provider diagnosed plaintiff with PTSD.  Tr. 955.  At that time, plaintiff presented as "a very anxious and vulnerable individual."  *Id.*  He described symptoms of PTSD, including nightmares and dreams. panic attacks, difficulty sleeping, and avoidant behavior, such as avoiding people because he thought they would leave him.  *Id.*  Shortly thereafter, in November 2018, plaintiff scored a 9 on a scale of 1 to 10, indicating a severe inability to cope with external reminders of events causing acute distress or impairment.  Tr. 1015.  Notably, these are all paragraph A criteria for PTSD. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.15(A).  Finally, records show that plaintiff was again diagnosed with PTSD by Brian Tucker, Psy.D., in November 2019.

Also even if there have been isolated times over the years when plaintiff did not meet the criteria for PTSD, he has otherwise been diagnosed with anxiety and major depressive disorder. For instance, records from October 2012 show that although plaintiff did not meet criteria for

PTSD at that time, he met the criteria for major depressive disorder and anxiety, and was referred to inpatient psychiatric care for a suicide attempt.  Tr. 463.  And, as further indication that mental health symptoms wax and wane, plaintiff was diagnosed with PTSD just several months before in May 2012, Tr. 475, and again afterwards in 2013.  Tr. 425.  Plus, the record shows plaintiff had a history of minimizing his PTSD symptoms.  Records indicate "[t]here is a concern about persistent arousal and reexperiencing symptoms of PTSD, however, [plaintiff] admits the [he] does not like to let people know about [his] difficulties."  Tr. 483; Tr. 490 (plaintiff's "traumatic experiences still haunt [him], though [he] doesn't admit it often").

The ALJ further relied on select notations in the record that showed plaintiff was "stable" on medication.  Tr. 17.  Plaintiff began taking the anti-depressant Lexapro in December 2012 after his attempts in October and December to overdose on pills.  Tr. 435.  In August 2013, plaintiff reported that Lexapro reduced the frequency and intensity of his depression symptoms. Tr. 421.  However, just a few months before that, plaintiff was in Lifeworks Day Treatment due to "increased depression and suicidal ideation including several overdose attempts and ER visits."  Tr. 422.  Again, "it is error to reject a claimant's testimony merely because symptoms wax and wane in the course of treatment."  *Garrison*, 759 F.3d at 1017.  Moreover, while there is evidence that Lexapro controlled plaintiff's depression symptoms, *see* Tr. 827 (March 2018), plaintiff was still diagnosed with PTSD.  *See* Tr. 955 (September 2018).

### E.    Activities

The ALJ noted that plaintiff "breeds reptiles and sells them online, cares for the home and the animals, organizes shipping and sales, and provides customer service."  Tr. 21 (citing Ex. 12F/2).  Elsewhere the ALJ observed that plaintiff "studies genetics and herpetology on his computer, watches videos about his specific interests, keeps extensive logs and notes about

reptiles, . . . prepares breakfast or has a protein bar, spends more time on the computer organizing information related to his reptiles, cares for the animals, cleans and tends to their environments, and keeps detailed logs about the animals (Exhibit 14F, page 10)." Tr. 24. The ALJ concluded that "[i]n light of the claimant's report that he sells the animals, engages in customer service and sales, and organizes shipping, these activities do not support the marked limitations in interaction and following instructions identified by the consultative psychologist." *Id.*

"An ALJ may consider any work activity, including part-time work, in determining whether a claimant is disabled." *Ford v. Saul*, 950 F.3d 1141, 1156 (9th Cir. 2020). But, here, as the ALJ herself recognized, plaintiff was employed merely "in *some capacity* as a reptile breeder" and there was no indication any work he did was "substantial." Tr. 16 (emphasis added).

And, again, the ALJ selectively chose portions of the record that do not reflect a complete picture of plaintiff's impairments. The ALJ relied on a portion of the report by Brian Tucker, Psy.D., but did not discuss it in the context of other portions of the same report that clearly illustrate plaintiff's limited functioning. The ALJ omitted portions of Dr. Tucker's report that describe how plaintiff's partner must prepare a written plan for plaintiff most days and how plaintiff "has difficulty independently performing and completing the following activities of daily living: housework and yard work, preparing meals, managing finances, bathing, eating, caring for hair, shaving, shopping, using public transportation, driving a car." Tr. 1036, 1039. Dr. Tucker's report further states that these activities of daily living "are impaired by various symptoms and [plaintiff] struggles to perform them on a daily basis," and plaintiff "relies heavily on his partner for assistance, reminders, and instructions to tend many daily living tasks." Tr.

1037. Dr. Tucker opined that plaintiff "required significant support and assistance with ADLs and IADLs, primarily provided by his partner" and "would not be able to live independently without this support and he would likely decompensate quite quickly without it." Tr. 1043. It was error for the ALJ to ignore these portions of Dr. Tucker's report.

Plaintiff's interest in animals, computer research, and videos does not change the analysis. "One does not need to be 'utterly incapacitated' in order to be disabled." *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001). In sum, in relying on plaintiff's activities, the ALJ failed to provide a clear and convincing reason, supported by substantial evidence, to discount plaintiff's allegations.

### F.    Secondary Gain

Finally, plaintiff argues that the ALJ improperly relied on evidence of secondary gain motivation. Pl. Br. 14. In this respect, the ALJ observed that "plaintiff later admitted ulterior motives," i.e., that "he feels guilty being cared for by others and felt Social Security Disability was the only way to secure resources to compensate those who provide him care," "his grandmother with whom he had not spoken for two years was 'managing' his Social Security claim," and he "planned to be a homemaker when his romantic partner's parents relocated and allowed them to live in their house." Tr. 21.

To begin, it is important to observe that "[b]y definition, every claimant who applies for Title II benefits does so with the knowledge—and intent—of pecuniary gain. That is the very purpose of applying for Title II benefits. The same motivation afflicts every applicant for workers compensation benefits, and every personal injury plaintiff. If the desire or expectation of obtaining benefits were by itself sufficient to discredit a claimant's testimony, then no claimant (or their spouse, or friends, or family) would ever be found credible." *Altorfer v. Colvin*, No.

3:14–CV–01933–HZ, 2015 WL 9255544, at *8 (D. Or. Dec. 18, 2015). "Thus, while an ALJ may consider motivation and the issue of secondary gain in evaluating symptom testimony, [the ALJ] must identify specific, clear and convincing evidence to do so." *Lehigh v. Comm'r, Soc. Sec. Admin.*, No. 6:16-CV-0902-JR, 2017 WL 4324545, at *7 (D. Or. Sept. 5, 2017), *report and recommendation adopted,* 2017 WL 4322819 (D. Or. Sept. 25, 2017) (citing *Burrell v. Colvin*, 775 F.3d 1133, 1139–40 (9th Cir. 2014)).

    None of the reasons provided by the ALJ is sufficient to establish improper secondary gain. Plaintiff's statement about wanting to compensate those who provide him with care is not inconsistent with his claim that he is unable to care for himself. That plaintiff's grandmother was managing his social security claim also does not indicate his claim is fabricated. The record shows that, over many years, plaintiff's grandmother has been concerned about plaintiff's mental health and heavily involved in helping plaintiff receive the treatment he needed. *See*, *e.g.*, Tr. 424 (grandmother reported concerns that plaintiff was trying to starve himself to death and was not eating or drinking, and was concerned about his suicidality); Tr. 437 (grandmother accompanied plaintiff to appointment regarding self-mutilation); Tr. 447 (grandmother reported to provider that plaintiff said he wanted to die and wanted him admitted; grandparents did not feel they could keep plaintiff safe); Tr. 454 (grandmother told provider that plaintiff voiced a wish to not wake up); Tr. 472 (grandmother reported to provider that plaintiff had fascination with knives and had stabbed knives into sister's bedroom door); *id.* ("grandmother . . . is very involved"). The fact that plaintiff had not spoken with his grandmother in two years does not undercut the legitimacy of his claim. Records indicate that plaintiff valued his "privacy" and that his grandmother had "expressed negative thoughts" about his transsexualism. Tr. 424; Tr. 437 (grandmother explicitly refused to refer to plaintiff by male gender). These are plausible

explanations for why plaintiff was not in better contact with his grandmother at the time he applied for benefits.

Lastly, the lone, fleeting statement in the record (which exceeds 1000 pages) where plaintiff said he "will be a homemaker," Tr. 1014, is insufficient to show ulterior motive. In that same chart note, the provider recognized plaintiff's PTSD diagnosis and indicated that plaintiff scored 9 out of 10, the latter indicating "severe inability to cope with external reminders of event(s) causing acute distress or impairment." Tr. 1013; *see also Burrell*, 775 F.3d at 1140 (holding the ALJ's "one weak reason" was insufficient to discount the claimant's symptom testimony).

In sum, the ALJ failed to provide clear and convincing reasons, supported by substantial evidence, to discount plaintiff's subjective symptom testimony.

## II.     Medical Opinion Evidence

The ALJ also erred in discounting Dr. Tucker's opinion.

### A.     Relevant Law

For claims filed on or after March 27, 2017, 20 C.F.R. § 404.1520c governs how an ALJ must evaluate medical opinion evidence under Title II and 20 C.F.R. § 416.920c governs for claims made under Title XVI. *Revisions to Rules Regarding the Evaluation of Medical Evidence* (*Revisions to Rules*), 82 Fed. Reg. 5844, *available at* 2017 WL 168819 (Jan. 18, 2017). Under these new regulations, ALJs no longer "weigh" medical opinions but rather determine which are most "persuasive." 20 C.F.R. §§ 404.1520c(a)-(b), 416.920c(a)-(c). To that end, controlling weight is no longer given to any medical opinion. *Revisions to Rules*, 82 Fed. Reg. 5844, at 5867-68; *see also* 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner evaluates the persuasiveness of all medical opinions based on (1) supportability, (2) consistency, (3)

relationship with the claimant, (4) specialization, and (5) other factors, such as "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements."  20 C.F.R. § 404.1520c(a), (c)(1)-(5); 20 C.F.R. § 416.920c(a), (c)(1)-(5).

The factors of "supportability" and "consistency" are considered to be "the most important factors" in the evaluation process.  20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). "[S]upportability" means "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support [the] medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(2); 20 C.F.R. § 416.920c(c)(1).  "[C]onsistency" means "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(2); 20 C.F.R. § 416.920c(c)(2).

The new regulations require the ALJ to articulate how persuasive the ALJ finds the medical opinions and to explain how the ALJ considered the supportability and consistency factors.  20 C.F.R. § 404.1520c(a), (b); 20 C.F.R § 416.920c(a),(b); *see Tyrone W. v. Saul*, No. 3:19-CV-01719-IM, 2020 WL 6363839, at *7 (D. Or. Oct. 28, 2020).  "The ALJ may but is not required to explain how other factors were considered, as appropriate, including relationship with the claimant (length, purpose, and extent of treatment relationship; frequency of examination); whether there is an examining relationship; specialization; and other factors, such as familiarity with other evidence in the claim file or understanding of the Social Security disability program's

policies and evidentiary requirements." *Linda F. v. Comm'r Soc. Sec. Admin.*, No. C20-5076-MAT, 2020 WL 6544628, at *2 (W.D. Wash. Nov. 6, 2020). However, ALJs are required to explain "how they considered other secondary medical factors [if] they find that two or more medical opinions about the same issue are equally supported and consistent with the record but not identical." *Tyrone*, 2020 WL 6363839, at *6 (citing 20 C.F.R. §§ 404.1520c(b)(2) and 404.1520c(b)(3)).

The court must continue to consider whether the ALJ's decision is supported by substantial evidence. *See Revisions to Rules*, 82 Fed. Reg. at 5852 ("Courts reviewing claims under our current rules have focused more on whether we sufficiently articulated the weight we gave treating source opinions, rather than on whether substantial evidence supports our final decision."); *see also* 42 U.S.C. § 405(g).

Under existing Ninth Circuit law, an ALJ must provide "clear and convincing" reasons to reject an uncontradicted opinion from a treating or examining doctor and "specific and legitimate" reasons to reject a contradicted opinion from such doctor. *Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 1995). The regulations pertaining to applications filed before March 27, 2017, set out a hierarchy for treatment of opinion evidence that, consistent with Ninth Circuit case law, gives treating sources more weight than non-treating sources, and examining sources more weight than non-examining sources. *See Standards for Consultative Examinations and Existing Medical Evidence*, 56 Fed. Reg. 36,932, *available at* 1991 WL 142361 (Aug. 1, 1991); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (adopting the "clear and convincing" and "specific and legitimate" standards for rejecting treating and examining source medical opinions); *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983) (holding that "[i]f the ALJ wishes to disregard the opinion of the treating physician, [the ALJ] must make findings setting

forth specific, legitimate reasons for doing so that are based on substantial evidence in the record").

The Ninth Circuit has not yet considered whether the revision of the 2017 regulations requires re-evaluation of the "specific and legitimate" standard for review of medical opinions. *See Robert S. v. Saul*, No. 3:19-CV-01773-SB, 2021 WL 1214518, at \*4 (D. Or. Mar. 3, 2021), *report and recommendation adopted*, 2021 WL 1206576 (D. Or. Mar. 29, 2021) (collecting cases). Nevertheless, "[e]ven under the Commissioner's new regulations, the ALJ must articulate why he has rejected the opinion" and "the Ninth Circuit's 'specific and legitimate standard' is merely a benchmark against which the Court evaluates that reasoning." *Scott D. v. Comm'r Soc. Sec.*, No. C20-5354 RAJ, 2021 WL 71679, at \*4 (W.D. Wash. Jan. 8, 2021); *see* 20 C.F.R. §§ 404.1520c(a), 416.920c(a).

### B.    Dr. Tucker

Dr. Tucker found plaintiff had marked limitations in his ability to carry out simple instructions, understand and remember complex instructions, make judgments on complex work-related decision, interact appropriately with the public, supervisors, and co-workers, and respond appropriately to usual work situations and changes in a routine work setting. Tr. 1046.

Dr. Tucker also opined that plaintiff's ability to concentrate, persist, or maintain pace and the ability to adapt and manage himself was affected. Tr. 1046. He further explained:

> Concentrate, persist, and maintain pace are all impaired by his mental health conditions. PTSD, anxiety, and depression symptoms all impact these abilities. PTSD related symptoms interfere with concentration and attention by interfering with his ability to direct attention to valued tasks and topics. PTSD causes him focus on stimuli or assess for stimuli that represents a threat to safety, both in the environment and internally.
>
> His brain, which has been exposed to extensive traumatic events, will always prioritize safety over work tasks even when no threat exists, as well as anticipate danger, especially in interpersonal contexts. This prioritization does not and

> cannot take into account the long-term impact of any behaviors that result, such as poor work performance or the consequences of not doing one's job. PTSD also causes an equally impairing, yet seemingly opposite effect in the form of dissociative or related symptoms, which is an uncontrollable coping response.

Dr. Tucker opined that, to a reasonable degree of medical or psychological probability, these limitations were first present in plaintiff's childhood. Tr. 1046. Dr. Tucker further opined that plaintiff's "prognosis over the next year, particularly regarding his ability to work, is estimated to be extremely unlikely to improve," and "his prognosis over the next three years is estimated to somewhat unlikely to improve." Tr. 1043.

The ALJ rejected Dr. Tucker's opinion because it was not consistent with plaintiff's daily activities. Tr. 24. That rationale is flawed for the reasons already discussed above.

The ALJ also discounted Dr. Tucker's opinion because it was inconsistent with plaintiff's presentation and test results:

> Dr. Tucker noted the claimant reported his mood was stressed and irritable and he had a constricted affect and was distractible, but the claimant's clothing was stylish and appropriate to the situation and weather, his movement and activity level was normal, he was anxious but cooperative, he was able to do serial seven calculations and spell words forward and backward (Exhibit 14F, pages 8-9). He demonstrated difficulty gathering his thoughts but was goal directed, and the Vineland-3 results were in the low or moderately low range (Exhibit 14F, pages 9-11).

Tr. 24. It is unclear how plaintiff's "stylish" clothing choice is indicative of whether he was credibly reporting his symptoms. *See* Tr. 441 (while plaintiff was dressed in "clean, fashionable and artistic clothing," he had been engaged in cutting behavior and was referred to the emergency room); Tr. 331 (plaintiff "pays close attention to what he wears but does not take care of his clothing" and cannot do laundry). The same is true for plaintiff's physical movements, considering the impairments at issue are mental in nature. Regarding the "serial seven" test, i.e., where plaintiff was asked to subtract integers of seven from the starting point of seven, Dr.

Tucker observed that plaintiff was "slow to respond to this task," something the ALJ failed to mention.  Tr. 1038.  The ALJ cited the fact plaintiff could "spell words forward and backward"; however, the only words he was asked to spell were HOUSE and his last name, *id.*, which is hardly a reason to discount Dr. Tucker's entire opinion and the years of history documenting plaintiff's impairments.  *Id.*  Finally, the ALJ cited to plaintiff's scores on the Vineland-3 test. Plaintiff in fact scored in the 3rd percentile on the Adaptive Behavior Composite, which provides an overall summary of plaintiff's adaptive functioning.  Tr. 1040.  This means "his score was greater than or equal to 3% of individuals in his age group."  *Id.*  His Communication standard score was in the 2nd percentile, his Daily Livings Skills score was in the 3rd percentile, and his Socialization score was in the 6th percentile.

In sum, the ALJ erred in evaluating the supportability and consistency factors in determining the persuasiveness of Dr. Tucker's opinion, and therefore erroneously rejected it.

## III. Remand

When a court determines the Commissioner erred in some respect in making a decision to deny benefits, the court may affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for a rehearing."  *Treichler*, 775 F.3d at 1099 (quoting 42 U.S.C. § 405(g)).  In determining whether to remand for further proceedings or immediate payment of benefits, the Ninth Circuit employs the "credit-as-true" standard when the following requisites are met: (1) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, (2) the record has been fully developed and further proceedings would serve no useful purpose, and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the plaintiff disabled on remand.  *Garrison*, 759 F.3d at 1020.  Even if all of the requisites

are met, however, the court may still remand for further proceedings "when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled[.]" *Id*. at 1021.

Here, the first requisite of the *Garrison* test is met. As discussed above, the ALJ erred in rejecting plaintiff's subjective symptom testimony and Dr. Tucker's opinion. The record is fully developed and further proceedings would serve no useful purpose.[5] If the improperly discredited evidence is credited as true, the ALJ would be required to find plaintiff disabled on remand. Finally, after reviewing the record, which is over 1,000 pages long, the court is convinced there is no serious doubt as to whether plaintiff is disabled. It is unnecessary to reach plaintiff's other arguments.[6]

## ORDER

The Commissioner's decision is REVERSED and this matter is REMANDED for immediate award of benefits.

DATED May 17, 2022.

/s/ Youlee Yim You

Youlee Yim You
United States Magistrate Judge

---

[5] In fact, after the ALJ issued a decision, plaintiff submitted an additional psychological evaluation that further bolsters his position. In light of the errors identified in this decision, it is unnecessary to consider that opinion here.

[6] Plaintiff also asserts the ALJ erred by failing to consider lay witness testimony, and made an argument that remand was required based on the appointment of Andrew Saul as Commissioner of the Social Security Administration. Plaintiff has withdrawn the latter argument in light of *Kauffman v. Kijakazi*, --.4th --, 2022 WL 1233238 (9th Cir. April 27, 2022).